UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DARRIN HILL, ET AL.                           CIVIL ACTION

VERSUS                                        NO. 13-2463

NEW ORLEANS CITY, ET AL.                      SECTION "B"(3)


ORDER AND REASONS

I.   NATURE OF MOTION AND RELIEF SOUGHT

Before the Court are Defendants'[1] Motion for Summary
Judgment seeking dismissal of the claims of Plaintiffs, Darrin
and Marie Hill (Rec. Doc. 105), Plaintiffs' Response thereto
(Rec. Doc. 112), and Defendants' Reply (Rec. Doc. 116). For the
reasons that follow, **IT IS ORDERED THAT** Defendants' Motion for
Summary Judgment (Rec. Doc. 105) is **GRANTED IN PART** and **DENIED
IN PART.**

II. FACTS AND PROCEDURAL HISTORY

This case arises out of the incarceration of Plaintiff
Darrin Hill for nearly two decades for an aggravated rape,

---

[1] Made defendants herein are: (1) The City of New Orleans; (2) Ronal Serpas,
in his official capacity as Superintendent of the New Orleans Police
Department; (3) Arnesta Taylor, in his official capacity as former
Superintendent of the New Orleans Police Department; (4) Cathey Carter, New
Orleans Police Department Detective; (5) Allen Gressert, New Orleans Police
Department Detective; (6) Antoine Saacks, Jr., New Orleans Police Department
Assistant Superintendent/Deputy Chief; (7) Joseph Hebert, New Orleans Police
Department Officer; (8) Howard Lewis, New Orleans Police Department Officer;
(9) Robert Haar, New Orleans Police Department Detective; (10) Daniel
Waguespack, New Orleans Police Department Crime Lab Criminalist; and (11)
Unidentified Parties.

1

kidnapping, and attempted burglary of which he was eventually exonerated via DNA evidence. The material uncontested facts are as follows:

On the night of July 1, 1992, two individuals, identified as E.V. and G.T. out of respect for their privacy, were present at the shore of Lake Ponchartrain in New Orleans, Louisiana. (Rec. Doc. 112 at 4).[2] At approximately 11 p.m., two indviduals confronted the couple. (Rec. Doc. 112 at 4). One of the individuals has since been confirmed to be Derrick Woodberry, a nearly 18-year-old, 6'1", 180-pound black male. (Rec. Doc. 112 at 4). Woodberry brandished a blue-steel handgun at the couple in an attempt to rob them. (Rec. Doc. 105-1 at 3). When informed that G.T. did not have a wallet, Woodberry instructed G.T. to walk into the lake and threatened to kill E.V. if G.T. did not comply. (Rec. Doc. 105-1 at 3). Woodberry then kidnapped E.V. and forced her at gunpoint to drive G.T.'s car to the parking lot of a nearby supermarket, where he struck her in the face with the gun and proceeded to anally rape her. (Rec. Doc. 112 at 4). Following this incident, Woodberry left in a red or burgundy colored Nissan vehicle with the unidentified accomplice who had followed him to the scene. (Rec. Doc. 112 at 4).

Later that night, on July 2, 1992 at approximately 12:53 a.m., New Orleans Police Department ("NOPD") Detective, Cathey

---

[2] G.T. and E.V. were boyfriend and girlfriend, respectively.

Carter ("Det. Carter"), was notified of the rape and armed robbery, and proceeded to meet with NOPD Officers Harold Lewis ("Ofc. Lewis") and Robert Haar ("Ofc. Haar"), who responded to the initial call regarding the incident. E.V. and G.T. related their account of the above events to Det. Carter. (Rec. Doc. 105-1 at 2-3). G.T. provided a detailed description to the officers of a perpetrator "6' to 6'2" tall, 180 lbs, 19 to 21 years old, with brown skin, short hair, and a thin build, wearing a red baseball cap, a red shirt, and dark color shorts, and displaying a blue steel handgun." (Rec. Doc. 112 at 5)(citing Rec. Doc. 112-9 at 94 – Handwritten Notes of Det. Carter). Following their meeting with G.T. and E.V., the officers requested assistance from a rape unit. (Rec. Doc. 105-1 at 3). E.V. was transported to a local hospital where a rape kit was collected and logged into evidence by Det. Carter, along with the underwear worn by E.V. immediately following the rape. (Rec. Doc. 112 at 9).

At approximately 2:00 p.m. on the day following the rape, July 2, 1992, E.V. contacted Det. Carter to inform her that a checkbook bearing the name "Darren Hill" and address "4860 Camelia Street" was found in G.T.'s vehicle, i.e., the vehicle in which the rape was committed. (Rec. Doc. 105-1 at 4).[3] Neither

---

[3] The Court notes Plaintiffs' contention that the evidence cited by Defendants in support of this fact states that "Det. Carter contacted [E.V.]," although such is immaterial for present purposes. (See Rec. Doc. 1112-1 at 7).

E.V. nor G.T. knew anyone by that name. (Rec. Doc. 105-1 at 5). The record reflects that at some point shortly following recovery of the checkbook, E.V. may have met with a police artist for purposes of creating a composite sketch of her aggressor, however the parties dispute whether such actually occurred.[4] In any event, a wanted bulletin was eventually created, identifying the perpetrator consistently with G.T.'s description of the subject, set forth *supra*. (Rec. Doc. 112-1 at 9).

Det. Carter was assigned as the lead investigator of the crimes against G.T. and E.V. and was assisted by Det. Allen Gressert. (Rec. Doc. 112 at 5). Following recovery of the checkbook, Det. Carter ran a search of the name "Darren Hill," which appears to have led to Plaintiff, Darrin Hill. Over the course of the ensuing investigation, G.T. and E.V. were each shown photographic lineups that included a photograph of Darrin Hill in an array of six individuals. (Rec. Doc. 112-1 at 10, 13).[5]  As will be discussed fully in the Court's analysis, the

---

[4] Plaintiffs note: "Defendants do not cite to any direct testimony regarding the circumstances of the creation [of] the composite drawing, only the resulting wanted bulletin (which does not discuss how the composite was created.)" (Rec. Doc. 112-1 at 9). Plaintiffs further note that the wanted bulletin matches a description of the subject that neither party disputes was furnished by G.T., rather than E.V. (Rec. Doc. 112-1 at 9).

[5] As is noted below, only E.V.'s alleged identification of Darrin Hill was relied upon for purposes of the application for arrest warrant in Plaintiff Hill's original case. The failure to also use G.T.'s alleged identification is curious to say the least and is a point of contention between the parties, discussed, *infra*.

parties vigorously dispute the circumstances surrounding both of these lineup procedures. However, Defendants contend that Plaintiff, Darrin Hill, was identified by both E.V. and G.T. upon viewing the photographic lineups. (Rec. Doc. 105-1 at6-7).

Det. Carter also conducted some degree of investigation into the address listed on the checkbook recovered from G.T.'s car. Although the particular address, 4860 Camelia, was unoccupied, that unit is part of a "double" complex and adjoins 4862 Camelia, an address Plaintiffs contend was then publicly listed as occupied by Trenetta Woodberry, sister of perpetrator Derrick Woodberry. (Rec. Doc. 106-2 at8). It is not clear that this information was sought or uncovered by Det. Carter at the time. However, the record reflects that a canvass of the surrounding neighborhood located a red Nissan vehicle matching the description of the escape car driven by Woodberry's accomplice to flee the scene of the rape. (Rec. Doc. 112 at 8). Det. Carter appears to have taken down the license plate information of this vehicle although, as will be discussed below, she did not further pursue this lead. (Rec. Doc. 112 at 8).

On July 17, 1992, Det. Carter applied for an arrest warrant for Plaintiff Darrin Hill, stating as grounds that: "through investigation the subject's identity was revealed. His B of I photograph was obtained and placed in a lineup, [and] during the

lineup, the victim positively identified the . . . subject as her assailant in the perpetration of the . . . offense." (Rec. Doc. 105-15 at 1 - Application for Arrest Warrant). The warrant was issued by a magistrate judge the same day. (Rec. Doc. 105-16).[6]

On August 23, 1992, Plaintiff Darrin Hill reported to an NOPD precinct with his mother, Plaintiff Marie Hill, after learning that Darrin was wanted in connection with the July 1 incident. (Rec. Doc. 105-1 at 9, 106-2 at 8). Hill was advised of his rights and arrested at that time. (Rec. Doc. 105-1 at 9). On October 1, 1992, a grand jury indicted Hill on charges of aggravated rape, second degree kidnapping, attempted aggravated crime against nature, and two counts of armed robbery. (Rec. Doc. 105-1 at 9). On October 7, 1992, Hill was arraigned and it appears E.V. identified him in court as the perpetrator of the rape. (Rec. Doc. 105-1 at 9).[7]

---

[6] As will be material for the discussion to follow, this reflects that the magistrate's probable cause determination was based, at most, on: (1) the checkbook recovered from G.T.'s car and (2) E.V.'s identification of Darrin Hill in connection with the photographic lineup procedure. There is no reference to any other evidence presented or relied upon in connection with the warrant application.

[7] Plaintiffs object that: "Defendants have cited no admissible evidence to support this fact. Defendants' only citation is to an allegation in Plaintiffs' complaint, explicitly made upon information and belief. Subsequent discovery has revealed no evidence that E.V. testified at Darrin Hill's arraignment, only that he entered a plea of not guilty." (Rec. Doc. 112-1). However, at the later trial of Derrick Woodberry in 2013, despite the fact that E.V. now acknowledges that Darrin Hill was not her rapist, E.V. testified that she identified Darrin Hill in court as the man who attacked and raped her. It is unclear whether this refers to Hill's arraignment or his actual trial, although this distinction is irrelevant here.

On November 9, 2012, a suppression hearing was conducted in the criminal district court in which the charges against Darrin Hill were pending. (Rec. Doc. 105-1 at 9). At this hearing, Hill sought to have evidence of E.V.'s identification suppressed. (Rec. Doc. 105-1 at 9). The State called Det. Carter and E.V. to provide sworn testimony about the photographic line-up.[8] The defense called no witnesses and the district court denied Hill's motion to suppress. (Rec. Doc. 105-1 at 9).

Given his serious mental illness, Hill was repeatedly deemed incompetent to assist in his own defense and to stand trial, causing him to remain incarcerated for the next seven years. (Rec. Docs. 112-2 at 25, 106-2 at 10).[9] On February 11, 1999, Hill was ultimately tried and found not guilty by reason of insanity.[10] (Rec. Doc. 105-1 at 10). As a result, Hill spent

---

[8] Plaintiffs dispute whether this was the same line-up shown to E.V. and/or G.T. (See Rec. Doc. 112-1 at 20)("There is no record that this lineup is the same lineup shown to E.V. on July 17, 1992. The lineup was designated with New Orleans Police Department Item No. G-0721-91, Catalog No. 52H2, Control Number C 018908, . . . but none of these numbers appear on the docket entry relating to the suppression hearing. . . . Moreover, although other evidence relating to Darrin Hill's criminal case has been found at the Orleans Parish Criminal District Court, including Hill's booking photograph and E.V.'s rape kit, . . . the photo array submitted into evidence at the November 9, 1992 hearing has never been found.")

[9] The record reflects that Hill suffers from bipolar and schizoaffective disorders as well as a borderline range of intellectual functioning. He resides with and is cared for by his mother, Plaintiff Marie Hill. (See Rec. Doc. 1 at 2).

[10] In Louisiana, such a determination requires (1) a finding beyond a reasonable doubt that the Defendant committed the factual elements of the charged offense, but (2) that he was criminally insane. *See, e.g., State v. Marmillion*, 339 So.2d 788, 796 (La. 1976); *State v. Branch*, 99-1484 (La. 3/17/00); 759 So. 2d 31. Thus, such an adjudication is the functional equivalent of a conviction. *See DeLeon v. City of Corpus Christi*, 488 F.3d

the following three years incarcerated.[11] Finally, in January 2012, the Orleans Parish Criminal District Court granted a joint motion by the New Orleans Innocence Project and the State of Louisiana to test the rape kit associated with the attack. (Rec. Docs. 105-1 at 10, 112-2 at 25). The DNA present on the swabs was revealed not to belong to Hill, but instead to Derrick Woodberry. (Rec. Doc. 105-1 at 10). Woodberry was later tried and convicted of E.V.'s rape and robbery as well as a similar incident that occurred in the early 1990s. (Rec. Doc. 112 at 10). Following his exoneration by DNA evidence, on April 26, 2012, counsel for Hill and the Orleans Parish District Attorney's Office filed a joint application to vacate Hill's conviction and dismiss the indictment against him. The Orleans Parish Criminal District Court granted the order the next day, on a finding by "clear and convincing evidence of . . . Darrin Hill's factual innocence," and ordered him released immediately. (Rec. Doc. 112-2 at 25).

On April 25, 2013, Plaintiffs Darrin and Marie Hill filed a Complaint in this Court seeking recovery for alleged damages sustained as a result of Defendants' actions. (Rec. Doc. 1)

---

639, 652-56 (5th Cir. 2007)(holding that "a deferred adjudication order is a conviction for the purposes of *Heck*'s favorable termination rule").

[11] Plaintiffs note that Hill's commitment was ordered continued on a number of occasions based on a finding that he presented a danger to others, based, Plaintiffs allege, "solely due to findings that he had committed the crimes against E.V. and G.T.." (Rec. Doc. 112-2 at 25).

Plaintiff Darrin Hill alleges deprivations of his civil rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, Title II of the Americans with Disabilities Act (the "ADA"), as well as the constitution and statutes of the State of Louisiana. (Rec. Doc. 1 at 26). Plaintiff Marie Hill alleges deprivations of her "right to familial association" under the First and Fourteenth Amendments to the United States Constitution as well as her right of consortium under the laws of the State of Louisiana. (Rec. Doc. 1 at 26).

## III. CONTENTIONS OF MOVANTS

Defendants advance six primary arguments in favor of summary judgment as to the claims of Hill. These are, first, that probable cause existed for Hill's arrest in 1992 based on the presence of the checkbook in G.T.'s car, the alleged identifications via photographic lineups, and other evidence known to officers at that time. Second, because probable cause existed for Hill's arrest, Defendants are protected from suit under the doctrine of qualified immunity. Third, Defendants argue that even in the absence of probable cause, they are still protected by qualified immunity because a reasonable, albeit mistaken, belief by officers as to the existence of probable cause is sufficient to invoke its protection. Fourth, Defendants argue Hill's claims relating to alleged deprivations of Fourth Amendment rights are prescribed as a matter of law at the time

of the instant suit. Fifth, Defendants argue Plaintiffs' claims under 42 U.S.C. § 1983 against Defendant, Police Chief Ronal Serpas, in his official capacity, fail under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Finally, Defendants argue Hill has not asserted a cognizable claim for relief under Title II of the ADA.

As to Plaintiff Marie Hill, Defendants argue Mrs. Hill's "familial association" claim does not exist, or, if it does exist, it was not "clearly established" for liability under § 1983 at the time of Hill's arrest, thereby entitling Defendants to qualified immunity on this issue.

## IV. CONTENTIONS OF OPPONENTS

### A. Plaintiff Darrin Hill

Plaintiff Darrin Hill argues Defendants mischaracterize his primary claim for relief, which is not one for false arrest under the Fourth Amendment, but rather a deprivation of due process under the Fourteenth Amendment via suppression of exculpatory evidence and suggestive identification procedures. Hill argues the underlying facts would allow a reasonable jury to infer deliberate police misconduct sufficient to prevent Defendants from invoking qualified immunity. Hill further argues that his Fourth Amendment rights were violated and that such claims are not prescribed for purposes of this suit because it was initiated within one year of the vacatur of his underlying

conviction and dismissal of the charges against him, citing *Heck v. Humphrey*, 512 U.S. 477, 112 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Hill further argues he has indeed asserted cognizable claims for relief under Title II of the ADA because a reasonable jury could find Defendants discriminated against him, in part, on the basis of his disability (i.e., his mental illness). Finally, Hill contends Defendants have failed to challenge his various state law claims which accordingly survive the instant motion.

### B. Plaintiff Marie Hill

As to her claims, Mrs. Hill argues Fifth Circuit jurisprudence recognizes a mother's right to recover for injury caused by the state's deprivation of her son's constitutionally secured liberty interests, citing *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 391 (5th Cir. 1992); *Logan v. Hollier*, 711 F.3d 690-91 (5th Cir. 1983). Mrs. Hill further argues that a constitutional right to familial association is recognized under Supreme Court cases such as *Stanley v. Illinois*, 405 U.S. 645 (1972) and *Moore v. City of East Cleveland*, 431 U.S. 494, 499 (1977), and that such right was "clearly established" by the time of Darrin Hill's arrest in 1992 for purposes of defeating qualified immunity.

### V. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, interrogatory answers, and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). A genuine issue exists if the evidence would allow a reasonable jury to return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the nonmoving party, the nonmovant must produce specific facts to demonstrate that a genuine issue exists for trial. *Webb v. Cardiothoracic Surgery Assocs. of N. Texas*, 139 F.3d 532, 536 (5th Cir. 1998). The moving party bears the initial responsibility of informing the district court of the basis for its motion. *Celotex*, 477 U.S. at 323. The movant must point to "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (citing Fed. R. Civ. P. 56). If and when the movant carries this burden, the nonmovant must then go beyond the pleadings and use affidavits, depositions, interrogatory responses, admissions, or other evidence to establish a genuine issue. *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[W]here the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. . . . Only when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party' is a full trial on the merits warranted." *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616 (5th Cir. 1994). Accordingly, conclusory rebuttals of the pleadings are insufficient to avoid summary judgment. *Travelers Ins. Co. v. Liljeberg Enter., Inc.*, 7 F.3d 1203, 1207 (5th Cir. 1993).

**VI. DISCUSSION**

 **A. Claims of Plaintiff Darrin Hill**

Before taking up Darrin Hill's various claims against Defendants, the Court is compelled to make very clear the context in which such claims must be analyzed. Although Defendants attempt throughout their Motion for Summary Judgment to cast various aspersions as to the possibility of guilt on the part of Hill, the uncontroverted evidence reveals the following: (1) Hill was conclusively exonerated of the rape of E.V. by DNA evidence, which neither party disputes; (2) DNA evidence has conclusively confirmed that the actual perpetrator of E.V.'s rape was Derrick Woodberry, who has since been tried and

convicted of that crime; and (3) E.V. consistently maintained throughout Hill's initial trial, and the subsequent proceedings relating to Mr. Woodberry's conviction, that only the perpetrator of the rape was involved in the attack and was present with her in G.T.'s car. Thus, syllogistically, there remains no doubt as to the fact that Darrin Hill is **_not_** guilty of the rape of E.V. and that he was **_not_** in the car with her at the time of that incident. Defendants' repeated attempts to blur this issue are misleading and troubling.

### 1) Claims of Due Process Violations under the Fourteenth Amendment

As noted above, Darrin Hill disputes Defendants' characterizations of his primary claims. These, he contends, relate to deprivations of due process guarantees under the Fourteenth Amendment through suppression of exculpatory evidence and use of suggestive identification techniques in securing his arrest, subsequent prosecution, and adjudication. Defendants argue that, regardless of the type of claim asserted by Plaintiff, they are entitled to the privilege of qualified immunity. This immunity shields public officials, including police officers, from liability and suit unless their conduct violates "clearly established" statutory or constitutional rights of which a reasonable officer would have known. *Babb v. Dowman*, 33 F.3d 472, 477 (5th Cir. 1994); *Gibson v. P.A. Rich*,

44 F.3d 274, 277 (5th Cir. 1995). Thus, in order to defeat qualified immunity, a plaintiff must "plead facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established at the time of the challenged conduct.'" *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011)(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). District courts have discretion to decide which of the two prongs to analyze first. *Id.*

### (a) Alleged Use of Suggestive Identification Procedures

In *Geter v. Fortenberry*, the United States Court of Appeals for the Fifth Circuit stated that an officer violates a suspect's Fourteenth Amendment Due Process rights when the officer "procures a false identification by unlawful means." 849 F.3d 1550, 1559 (5th Cir. 1988)("*Geter I*"). In that case, the defendant brought a § 1983 claim arising out of his arrest, prosecution, and conviction for a robbery he was ultimately proven not to have committed. *Id.* The Court held there was no legal issue as to the fact that "a police officer cannot avail himself of a qualified immunity defense if he procures false identification by unlawful means . . . for such activity violates clearly established constitutional principles." 849 F.2d at 1559. However, the court concluded that the plaintiff's

allegations as to the deliberate manipulation of evidence by police officers were overly conclusory and therefore remanded to the district court for additional discovery to determine whether sufficient facts existed to preclude summary judgment on the qualified immunity defense. 849 F.2d at 1559-61.[12] On remand, the plaintiff came forward with specific allegations that officers had obtained false and fraudulent identifications by, *inter alia*, insisting that witnesses pick an individual from a photo lineup, prodding witnesses to select another picture when they had chosen "incorrectly", and becoming hostile when a witness refused to cooperate. *See Geter v. Fortenberry*, 882 F.2d 167, 170-71 (5th Cir. 1989)("*Geter II*"). These, the Fifth Circuit concluded on second appeal, were sufficient to affirm the district court's denial of summary judgment on the issue of qualified immunity as to the plaintiff's charges of due process violations stemming from suggestive identification procedures. 882 F.2d at 170. As the foregoing indicates, at least as early as 1988, the time of *Geter I*, it was "clearly established" for purposes of the qualified immunity framework that deliberately securing a false identification through unlawful means amounted to a constitutional harm under the Fourteenth Amendment, which

---

[12] See *Geter I*, 849 F.2d at 1559 ("Geter's charges in his federal pleadings against [the officer] are, however, conclusory assertions without the leaven of confirming factual details. For example, Geter's complaint never states who gave the false identifications, what 'unlawful means' were used to procure the identifications, or what exculpatory evidence [the officer] suppressed and concealed.")

could form the basis of a valid cause of action under § 1983. Thus, the sole issue where this type of claim is asserted is as to whether the plaintiff has sufficient factual support to establish his claims in order to overcome a summary judgment motion.

In *Good v. Curtis*, the Fifth Circuit had occasion to review facts strikingly similar to those at issue in the instant matter. 601 F.3d 393 (5th Cir. 2010). There, the court stated:

> [T]his case concerns a situation where the criminal defendant has been exonerated and was wrongly convicted because—taking the facts most favorable to [the plaintiff]—a police officer deliberately framed him. The DNA evidence that cleared [the plaintiff] and secured his freedom also removes all doubt as to the inaccuracy of [the witness's] identification. The reason for the misidentification, we must assume at this summary judgment juncture, was [the officer's] concerted efforts to manipulate the photo.

*Id.* at 398. Relying on the *Geter* decisions, the court concluded the plaintiff's allegations that the officer stated he planned to frame the plaintiff for failing to cooperate; that the officer artificially manipulated the plaintiff's photograph to conform to a composite sketch and description of the perpetrator of the crime; and that the officer knowingly presented the altered photograph with the purpose of obtaining a false identification, were sufficient to "create a factual basis for

finding a constitutional violation within [the plaintiff's] Fourteenth Amendment § 1983 claim." *Id.* at 399-400.

In the present case, Hill alleges the "unlawful means" employed to secure his false identification included the use of the photographs of two white individuals in the photo array presented to E.V. and G.T., as well as the presentation of the photograph of an individual who was approximately twice Hill's age at the time. These facts, Hill alleges, rendered the lineup unduly suggestive. (See Rec. Doc. 112-2 at 17).

As noted above, the description provided by G.T. of the physical characteristics of E.V.'s aggressor indicate him to have been a black male approximately 19 to 21 years old. NOPD policy relating to photographic lineups at the time required that the photographs "shown . . . be of persons of the same race and similar in age and physical characteristics" as the suspect. (*See* Rec. Doc. 112-2 at 16). Thus, information indicating that half of the photographs depicted individuals with dramatically different appearances from Hill's (and from the alleged perpetrator) raises an inference that the procedure was unduly suggestive.[13] This inference is bolstered in the context of a summary judgment motion in which all reasonable inferences are

---

[13] Plaintiffs note that the lineup itself is missing, but that records of the individuals selected for inclusion of the lineup still exist. The individuals' names and Bureau of Identification ("B of I") numbers appear to have been preserved and form the basis for Plaintiffs' contentions concerning the identification procedure. (See Rec. Doc. 112-2 at 16).

to be drawn in favor of the non-movant, Hill. Parties also dispute by reference to various state records the ability of the rape victim to make an un-suggested identification of Hill. (See Rec. Docs. 112 at 14-5; 112-2 at 7; 112-8 at 91; 105-1 at 17).

Viewing the foregoing in the light most favorable to the non-movant, a genuine and triable issue of material fact exists as to whether Defendants employed an unduly suggestive lineup procedure to obtain a false identification of Plaintiff Darrin Hill. A reasonable jury could decide that issue either way.[14]

### (b)   Alleged Suppression of Exculpatory Evidence

Plaintiffs further argue that Defendants infringed Hill's due process rights by suppressing allegedly exculpatory evidence. Specifically, Plaintiffs contend that failure to disclose information relating to (i) the circumstances surrounding E.V.'s identification, (ii) various discrepancies relating to an alleged identification by G.T., (iii) the information uncovered while investigating the address listed on the checkbook, and (iv) the alleged omission of the results of analysis of the rectal swabs collected following the rape, all

---

[14] *See, e.g., Good v. Curtis*, 601 F.3d 393, 400 (5th Cir. 2010)("Having found a constitutional violation, we turn briefly to the second prong of qualified immunity . . . . [Q]ualified immunity generally protects 'all but the plainly incompetent or those who knowingly violate the law ' *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). In the instant case, Curtis is alleged to have intentionally secured a false identification that produced a wrongful conviction in retaliation for a suspect's failure to cooperate in an unrelated matter – a *Malley* 'knowing violation of the law.'")

raise the inference that Defendants suppressed exculpatory evidence in violation of Hill's due process rights.

### i.    Credibility of E.V.'s Identification

As to E.V.'s identification of Hill, Plaintiffs argue that (i) the failure to point out E.V.'s initial inability to confirm that she could identify her assailant, (ii) failure to note the extended amount of time it took for E.V. to identify Hill, (iii) failure to expressly transcribe the manner in which E.V. selected Hill's photograph, and (iv) failure to indicate that Det. Carter confirmed with E.V. that she had selected the man whose name appeared on the checkbook, all constituted the suppression of exculpatory evidence. (See Rec. Doc. 112-8 at 91.). Plaintiffs argue this evidence would have materially compromised the credibility of E.V.'s identification for purposes of the magistrate's probable cause determination, the result of Hill's suppression hearing, and ultimately his adjudication. (Rec. Doc. 112 at 13-17). Det. Carter's warrant application suggests that effectively the sole piece of evidence presented to the magistrate judge was E.V.'s identification of Hill in the photo array. Although there is a general reference to "investigation", nothing in the warrant application specifically refers to the discovery of the checkbook in E.V.'s car, nor that this checkbook was ever confirmed to actually

belong to Hill during the initial proceedings.[15] Thus, there is a reasonable inference to be drawn that disclosure of the evidence relating to the credibility of E.V.'s identification of Hill could have resulted in a denial of the initial warrant application.[16]

### ii.    G.T.'s Allegedly Exculpatory Identification

Plaintiffs also argue the evidence suggests officers may have suppressed an exculpatory identification by G.T.. To this end, Plaintiffs note G.T. testified that he participated in a photographic lineup selection in 1992, in which he identified an individual as the perpetrator. (See Rec. Doc. 112 at 12)(citing G.T. *Woodberry* Trial Testimony – Rec. Doc. 105-13 at    12; Deposition of G.T. – Rec. Doc. 105-14 at 28).  However, there is no contemporaneous report of that identification procedure; no evidence that G.T. was asked to sign the photograph selected (as required pursuant to NOPD procedure); no motion to suppress any

---

[15] The warrant application states, in relevant part: "Through investigation the subject's identify was revealed, his B of I photograph obtained and placed in a lineup. During this lineup, the victim positively identified the above subject as her assailant in the perpetration of the above offenses." (Rec. Doc. 105-15). Although Hill appears to have later acknowledged that the checkbook belonged to him (Plaintiffs argue it was taken from him by Woodberry, and further object to the admissibility of Hill's testimony given the repeated findings that he is incapable of standing trial), this does not appear to have occurred until 2012, and would therefore not have been evidence for purposes of the warrant application or initial hearings relating to Hill's prosecution. (See Rec. Doc. 112-1 at 7).

[16] Defendants contend that discovery of the checkbook bearing the name "Darren Hill" alone amounted to probable cause for Hill's arrest. However, the fact that there is no reference to the checkbook in the warrant application as well as the information relating to the investigation of the address listed on the checkbook, discussed *infra*, belie this notion.

identification by G.T. in the original proceedings; and the record reflects that various defendants denied contemporaneous knowledge of G.T.'s participation in any such procedure (although they now appear to concede that G.T. was, in fact, shown a lineup at some point in time). (See Rec. Doc. 112 at 12). Plaintiffs cite deposition testimony of Defendants, Det. Allen Gressertt, Sergeant Joseph Hebert (Det. Carter's supervisor), and non-party Det. Lymous, that, had G.T. made a positive identification of Hill, there would have been no reason to fail to record or report as much during the initial investigation of Hill and his subsequent prosecution. (See Deposition of Gressertt - Rec. Doc. 112-9 at 43-46; Deposition of Lymous – Rec. Doc. 112-5 at 48-50; Deposition of Hebert – Rec. Doc. 112-6 at 35-38). Thus, there is an issue of fact as to whether G.T. was shown a photographic lineup and, if so, whether he identified an individual other than Hill, which evidence was suppressed by Defendants.[17] Further supporting a triable issue on this item is G.T.'s alleged certainty that the individual he identified at the time of the initial lineup review was Hill and that Hill was E.V.'s aggressor. (See Rec. Doc. 105-1 at 7). G.T.'s apparently staunch adherence to this position in the face

---

[17] Indeed, Sergeant Hebert testified that if information came to light that an exculpatory identification had been made and suppressed, the entire investigation would have had to have been re-examined. (Rec. Doc. 112- at 37-38).

of conclusive DNA evidence to the contrary could, at the very least, support a reasonable inference by the trier of fact that G.T. was either exposed to suggestive identification procedures or that G.T.'s credibility was faulty.[18] As such, Defendants are not entitled to summary judgment on this issue.

### iii.      *Information Relating to the Checkbook*

A plaintiff seeking recovery from a police officer for the type of constitutional tort alleged here "must tender evidence establishing misconduct that exceeds mere negligence." *Sanders v. English*, 950 F.2d 1152, 1159 (5th Cir. 1992). Generally, mere negligence in pre- or post-arrest investigations will not rise to the level of actionable conduct. *See Herrera v. Millsap*, 862 F.2d 1157, 1160 (5th Cir. 1989)(summary judgment appropriate when plaintiff's evidence, at most, showed mere negligence in investigating facts before obtaining arrest warrant); *Simmons v. McElveen*, 846 F.2d 337, 339 (5th Cir. 1988)(summary judgment appropriate when plaintiff's evidence merely established that defendants were negligent in conducting post-arrest investigation and in failing to inform district attorney's

---

[18] Plaintiffs cite the "Eyewitness Identification Expert Summary Report" prepared by Jennifer Dysart, Ph.D., Deputy Chair of the Department of Psychology, John Jay College of Criminal Justice, (Rec. Doc. 112-10 at 19), to explain that: "G.T.'s continued belief today that he identified Darrin Hill despite Darrin Hill's proven innocence is a classic example of the effects of commitment bias."; *see also*, *Good v. Curtis*, 601 F.3d 393, 399 (5th Cir. 2010)("Applying *Geter I and II* to the instant case, Good has clearly met his burden at this early stage. Good alleged that Doe's identification was tainted by Curtis's conduct. That taint persists to this day as Doe still insists on Good's guilt even after his exoneration by indisputable forensic evidence.")

office of exculpatory evidence)(cited in *Sanders*, *supra*, 950 F.2d at 1159). However, when an officer deliberately conceals exculpatory evidence or fails to release an arrestee once he learns of the arrestee's innocence, rather than merely negligently failing to uncover exculpatory evidence, such may be sufficient to defeat summary judgment. *See Geter II*, 882 F.2d at 170-71 (deliberate concealment of exculpatory evidence violates clearly established constitutional principles); *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992)(failure to release after officer knew or should have known of innocence, rather than allegation of failure to take affirmative steps to investigate, sufficient to state cause of action); *Gay v. Wall*, 761 F.2d 175, 178-79 (4th Cir. 1989)(*Baker* does not preclude a cause of action under § 1983 premised on an officer's failure to release an arrestee once he learns of the arrestee's innocence)(cited in *Sanders*, *supra*, 950 F.2d at 1162).

Plaintiffs argue Defendants deliberately ignored evidence pointing away from Hill, particularly information that could have been uncovered through proper investigation of the information on the checkbook found in G.T.'s car and the absence of any mention of mental illness in the descriptions provided to police by E.V. and G.T.. (Rec. Doc. 112 at 8-9). To this end, Plaintiffs argue that Hill's severe mental illness would have

been plainly apparent to officers at his initial interview and that this should have put them on notice that Hill did not match the description provided by the witnesses, neither of whom made any reference to mental illness. They further argue that the discrepancies between the spelling of "Darren Hill" on the checkbook and Hill's name, Darrin Hill, as well as the fact that the address on the checkbook did not match Hill's address, further cast doubt as to Hill's identity as the perpetrator. Finally, the record reflects that the address of the adjoining unit was publicly listed as occupied by actual perpetrator Derrick Woodberry's sister and that a red Nissan matching the description of the getaway vehicle was located in the same neighborhood. (See Rec. Doc. 106-2 at 19). Det. Carter did not proceed to investigate further the occupant of the adjoining unit or the lead as to the getaway vehicle. (Rec. Doc. 112 at 19).

As to the facts of Hill's mental illness being readily apparent and the spelling of his name not matching that on the checkbook exactly, these items would have been equally apparent to the magistrate, grand jury, and district judge, all of whom reviewed the evidence presented to them. As such, the Court does not see how Plaintiffs can reasonably characterize these items as having been suppressed. To the extent Plaintiffs rely on these items to suggest that Defendants should have further

pursued the leads as to the occupant of the unit adjoining 4860 Camelia and the getaway vehicle, it is also unclear that this conduct would rise above the level of negligence, so as to become actionable under § 1983.

Nevertheless, Det. Carter appears not to have reported that Hill did not reside at the address indicated on the checkbook (which she later conceded at her deposition would have been important information at the time of her 1992 investigation)[19] and further that a vehicle matching the description of the getaway vehicle was located near that address (which would have increased the likelihood that the address was a relevant location to the perpetrator). These may reasonably be characterized as the omission of exculpatory evidence because their disclosure would have weakened the relevance of Darrin Hill's name being a close match to the one on the checkbook recovered from G.T.'s car. Because it appears that the checkbook name was possibly the only other piece of evidence used in conjunction with E.V.'s identification for the initial warrant

---

[19] See Rec. Doc. 112-8 at 188-89 (Deposition – Det. Carter) ("Q. And if it turned out that the person living at 4860 Camelia Street was not Darrin Hill, that would be important information for an investigator; correct? A. Correct. Q. Because that would tend to indicate that the checkbook might be the kind of checkbook that was used for criminal activity; correct? A. Correct.").

Although Det. Carter states that she does not specifically remember whether she spoke to anyone who lived at 4860 Camelia at the time of her canvass, she acknowledges that she would have written such a fact down, had it occurred. (Rec. Doc. 112-8 at 72). This combined with evidence that 4860 Camelia was unoccupied at the time of the investigation raise a triable issue as to whether Det. Carter confirmed that Darrin Hill did not reside at 4860 Camelia and then failed to report this exculpatory information. (See Rec. Doc. 112-10 at 6, 8).

application, if at all, evidence indicating Darrin Hill was not connected to this address would have been exculpatory and a jury could reasonably find that it was intentionally suppressed by Det. Carter. As such, there barely remains a triable issue as to whether Det. Carter deliberately suppressed potentially exculpatory evidence relating to the lack of connection between Darrin Hill and the address listed on the checkbook recovered from G.T.'s car.

### iv. Alleged Suppression of Exculpatory Forensic Evidence

Most troubling of all the items of exculpatory evidence alleged to have been suppressed by Defendants are the results of the analysis of the rectal swabs collected immediately following E.V.'s rape. According to Plaintiffs, the results of forensic tests connected with the investigation were reported directly to Det. Carter. Moreover, the results of every forensic report commissioned - apart those relating to the rectal swabs - are contained in Hill's original case file. (Rec. Doc. 112 at 17). Because analysis of the DNA contained on the rectal swabs is what ultimately exonerated Hill roughly twenty years later, the omission of this critical piece of evidence is stunning.[20] Thus,

---

[20] Evidence in the record corroborates Plaintiffs' contentions that the results of other forensic tests were included in Hill's case file. (See Rec. Doc. 112-3). Additionally, an item reflecting the results of a "Seminal Fluid – Blood Grouping" examination (Rec. Doc. 112-3 at 48), apparently prepared by the Orleans Parish Coroner's Office and dated "7/6/92", was produced to

a genuine issue of fact exists as to whether Det. Carter and/or other defendants deliberately suppressed the results of the rectal swab analysis, which, if confirmed, would amount to a violation of Hill's due process rights.[21] This issue is properly reserved to the jury.

### v. Conclusion as to Hill's Fourteenth Amendment Claims

Viewing the foregoing allegations in conjunction with supportive record evidence in the light most favorable to Hill as non-movant, it is clear that various issues of disputed fact exist sufficient to survive summary judgment on Hill's Fourteenth Amendment claims. If Hill is able to persuade a jury that Defendants engaged in suggestive identification techniques and deliberately suppressed items of exculpatory evidence, he will have made out a clear claim for violation of his due process rights under the Fourteenth Amendment. This is conduct that was "clearly established" as violative of constitutional rights and actionable under § 1983 at the time of Hill's initial prosecution in 1992. *See Brown v. Miller*, 519 F.3d 231, 238 (5th Cir. 2008)("By 1967, a public official's concealment of

---

Plaintiffs in connection with this litigation – demonstrating that seminal fluid testing did occur in connection with the initial investigation. If Plaintiffs are correct that the results of this examination were deliberately suppressed from Hill's case file, such conduct will be actionable as a deprivation of Hill's due process rights under the Fourteenth Amendment.

Plaintiffs further allege that forensic evidence in the form of a report of any comparison between Darrin Hill's fingerprints and the latent prints lifted from the crime scene is also missing from the case file. (Rec. Doc. 112-2 at 24).

exculpatory evidence was a constitutional violation in this circuit."). Defendants are not entitled to qualified immunity on this claim. Further, it is no answer, as Defendants contend, that the issuance of a warrant by a neutral magistrate or an indictment by a grand jury would somehow attenuate the taint of the procedures employed if they are proven to have been suggestive and deliberately suppressive of exculpatory evidence. *See Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988)("Any misdirection of the magistrate or the grand jury by omission or commission perpetuates the taint of the original official behavior."); *Good v. Curtis*, 601 F.3d 393, 400 (5th Cir. 2010)("[T]o the extent that this doctrine applies to the Fourteenth Amendment, Curtis's failure to disclose that he manipulated the lineup or that Doe's resulting testimony may have been tainted preserve the causal chain.")

### 2) Claims of Fourth Amendment Violations

A "longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Camreta v. Greene*, 131 S.Ct. 2020, 2031, 179 L.Ed.2d 1118 (2011)(citing *Lying v. Northwest Indian Cemetery Protective Assn.*, 485 U.S. 429, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988)). However, the regular policy of constitutional avoidance does not always fit the qualified

immunity situation, because "it threatens to leave standards of official conduct permanently in limbo," such that officials may persist in challenged practices, knowing they can avoid liability in future damages actions. *Id*. Thus, although the Court resolves Hill's Fourth Amendment claims on limitations grounds, it is necessary to address the substantive validity of any such claims as a prudential matter as well as for purposes of application of the relevant limitations periods.

### i.      *Defendants' Contentions Relating to Probable Cause*

As to Hill's claim of an unreasonable seizure under the Fourth Amendment, made actionable under § 1983, Defendants also focus in large measure on the notion that Hill cannot demonstrate an absence of probable cause for his arrest. This, Defendants contend is fatal to his claim. (See. Rec. Doc. 105-1 at 1). They further argue that the issuance of an arrest warrant by a magistrate as well as indictment by a grand jury further insulate Defendants from liability under § 1983. (Rec. Doc. 105-1 at 8). The Court is not inclined to agree with this overly simplified interpretation of Fourth Amendment jurisprudence in this area.

To be sure, "[t]he Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted – indeed

30

for every suspect released." *Baker v. McCollan*, 443 U.S. 137, 145, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). Thus, as a general rule, where an alleged Fourth Amendment violation "involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that officers acted in an objectively reasonable manner," so as to entitle them to the protection of qualified immunity. *Messerschmidt v. Millender*, 132 S.Ct. 1235, 1245 (2012)(citing *United States v. Leon*, 468 U.S. 897, 922-23, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)). It is equally true, however, that an exception allowing suit exists where, for example, "the warrant was 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.*

Recently, the Fifth Circuit, in *Good v. Curtis*, had occasion to apply this standard under similar circumstances. There, the court stated:

> [W]e conclude that Curtis is not entitled to qualified immunity on Good's Fourth Amendment claims. Contrary to Curtis's arguments, "[t]he initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested, for example ... and some such claims may be made under 42 U.S.C. § 1983." *Castellano v. Fragozo,* 352 F.3d 939, 953-54 (5th Cir.2003) (en banc). "As applied to the qualified immunity inquiry, the plaintiff

> must show that the officers could not have reasonably believed that they had probable cause to arrest the plaintiff for any crime." *O'Dwyer v. Nelson,* 310 Fed.Appx. 741, 745 (5th Cir.2009) (citing *Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004)). . . . On June 18, 1983, Good was arrested for the rape and burglary of Doe on a warrant issued upon Curtis's probable cause affidavit. This second arrest forms the foundation of Good's Fourth Amendment claim. At the time he swore out the probable cause affidavit for the second arrest, Curtis had no evidence before him suggesting Good was the perpetrator other than the false identification he procured from Doe. Accordingly, Curtis could not have reasonably believed that he had probable cause to arrest Good, and the district court did not err in determining that the genuine issues of fact were material such that he is not entitled to summary judgment on qualified immunity in the instant case.

*Good v. Curtis*, 601 F.3d 393, 401 (5th Cir. 2010). In the present case, Plaintiff alleges that E.V.'s identification was tainted by the unduly suggestive nature of the tactics used in procuring it. Plaintiff further alleges that officers were aware at the time they submitted the application for Hill's arrest that G.T. had made an exculpatory identification, and that they were further on notice that Hill did not reside at the address listed on the checkbook recovered from G.T.'s car. Importantly, the only discrete item of evidence specifically recited in the warrant application is the identification "by the victim" (E.V.). Viewing the evidence in the light most favorable to Plaintiff, there is a triable issue as to whether a reasonable

officer would have believed probable cause existed to support
the warrant application if it was, indeed, based solely on
E.V.'s tainted identification. Thus, there is a genuine issue as
to whether probable cause existed at all.[22]

Notwithstanding the above, in *Franks v. Delaware*, the
Supreme Court recognized that where "a false statement knowingly
and intentionally, or with reckless disregard for the truth, was
included by the affiant in the warrant affidavit, and . . . the
alleged statement is necessary to the finding of probable
cause," a cognizable Fourth Amendment injury occurs such that
evidence obtained from a search authorized by the warrant must
be excluded "to the same extent as if probable cause was lacking
on the face of the affidavit." 438 U.S. 154, 155, 98 S.Ct. 2674,
57 L.Ed.2d 667 (1978). Thus, the relevant inquiry is whether,

---

[22] Further, Plaintiffs correctly note that many of the items relied upon by
Defendants in support of their argument that probable cause existed do not
support such a finding under relevant standards. (Rec. Doc. 112 at 2). These
include (listed at Rec. Doc. 105-1 at 17): (1) that Darrin Hill's checkbook
was found in the vehicle in which E.V. was raped (a fact that was not
conclusively established until 2012); (2) that E.V. identified Darrin Hill in
the lineup "without having seen him other than on the night of her attack" (a
statement that has been disproven by forensic evidence and the import of
which has further been impugned by Plaintiffs' allegations herein); (3) that
both victims repeatedly identified Darrin Hill in and out of court (the
record does not reflect that G.T. identified Darrin Hill in court in the
initial proceedings – further his alleged identification in connection with
the initial proceedings was not reported by Defendants); (4) that G.T.
continues to be "one hundred percent certain" that he saw Darrin Hill on the
night of the attack (this statement does not reflect G.T.'s testimony who
maintains, erroneously, that Hill was E.V.'s attacker, notwithstanding the
fact that his *ex post facto* mental impressions are irrelevant to the facts as
they existed in 1992); (5) an arrest warrant issued by a neutral magistrate
judge (Plaintiffs' allegations that the evidence submitted to the magistrate
was tainted remove the neutral intermediary inference); and (7) a criminal
court judge upheld E.V.'s identification (here again, allegations of tainted
evidence remove the potential imprimatur of a neutral intermediary).

excluding the false information, there is sufficient evidence contained in the affidavit to support the magistrate's probable cause finding. *Id.* at 156. To the extent Det. Carter's statement that E.V. identified Hill as her assailant could be characterized as a misstatement – if Plaintiff is correct that the identification was the result of suggestive procedures – Plaintiff has articulated an actionable Fourth Amendment *Franks* violation sufficient to overcome Defendants' qualified immunity. *See*, *United States v. Martin*, 615 F.2d 318, 328 (5th Cir. 1980)(recognizing that the *Franks* rule deals with misstatements).

Further, the alleged misstatements in the warrant application are not the only basis for finding an actionable Fourth Amendment violation under present circumstances. As noted in *Martin*, *supra*, *United States v. Park*, 531 F.2d 754, 758-59 (5th Cir. 1976), "recognized that allegations of material omissions were to be treated essentially similarly to claims of material misstatements." 615 F.2d at 328; *accord*, *Hale v. Fish*, 899 F.2d 390, 400, n.3 (5th Cir. 1990)("The holding in *Franks* applies to omissions as well."). Thus, in the present circumstances where Hill complains of the omission of various items of exculpatory evidence,[23] it becomes necessary to

---

[23] Which include: G.T.'s exculpatory identification, the suggestive techniques used to procure E.V.'s identification as well as her delay in making an identification, the fact that Darrin Hill did not reside at the address

34

determine "that the omissions were in fact made, and, second, that they were made intentionally or with a reckless disregard for the accuracy of the affidavit." *Id.* If so, the Court is required to determine "whether, if the omitted material had been included in the affidavit, the affidavit would still establish probable cause for" the plaintiff's arrest." *Id.* The degree of intent is material, as "negligent omissions will not undermine the affidavit." *Martin*, *supra*, 615 F.2d at 329 (citing *United States v. House*, 604 F.2d 1135, 1141 (8th Cir. 1979). Here, Defendants have conceded in deposition testimony that, if true and known to officers at the time, the fact of an exculpatory identification by G.T.; that Darrin Hill did not reside at 4860 Camelia; that a vehicle matching the getaway car was found near that address; and that E.V. hesitated before identifying Darrin Hill, would all have been important items to report in their investigation. Thus, viewing the evidence in the light most favorable to Hill (to conclude that these facts exist), their omission from the warrant application would certainly appear to have been the result of deliberate manipulation in order to secure a finding of probable cause. *See, e.g., Hale*, *supra*, 899

---

listed on the checkbook found in G.T.'s car, that a vehicle matching the description of the getaway vehicle was located near that address, and that Darrin Hill's appearance differed from the description provided by G.T. in a number of ways, not least of which is his apparent severe mental illness. The record reflects that Hill was, at the time, 26 years old, 5'7" tall, and 135 pounds (i.e., up to 7 years older, up to 7" shorter, and nearly 50 pounds lighter than the description provided to NOPD of the perpetrator). (See Rec. Doc. 112 at 4).

F.2d at 400 ("If the facts omitted from an affidavit are 'clearly critical' to a finding of probable cause, then recklessness may be inferred from the proof of the omission itself.")(citing *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980)). There is a genuine issue remaining as to whether the inclusion of these facts would have allowed the magistrate judge to conclude that probable cause existed to issue a warrant for Hill's arrest, particularly where the basis for that action appears to have relied entirely upon the alleged identification by E.V..

In light of the foregoing, it appears Hill asserts valid causes of action for deprivations of his Fourth Amendment rights under § 1983. However, as discussed below, these claims were nevertheless time-barred at the filing of this suit in April 2013.

### (a)    Prescription of Plaintiff's Fourth Amendment Claims

It is well-settled that the question of the length of the prescriptive or limitations period applicable to a § 1983 action is determined by reference to state personal injury law, while the accrual of such period is a question of federal law. *Wallace v. Kato*, 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2006). In the context of the general false imprisonment action, the limitations period begins the moment the arrestee becomes

detained pursuant to legal process. *Id.* at 389. This is because false imprisonment consists of detention without legal process. *Id.* In the vast majority of cases, it must be assumed, this occurs when "he is bound over by a magistrate or arraigned on charges"; the point at which he becomes held pursuant to process. *Id.* Thus, in the context of a "false arrest" claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. *Wallace*, 549 U.S. at 390. By contrast, once legal process is issued, "unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process. . . . From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself." *Id.*

Under these circumstances, neither party adequately addresses the material distinction between the pre- and post-trial periods of Hill's detention. *See Castellano v. Fragozo,* 352 F.3d 939, 959 (5th Cir. 2003)("[W]e adhere to the view that the umbrella of the Fourth Amendment, broad and powerful as it is, casts its protection solely over the pretrial events of a prosecution," while noting that recovery for damages arising from trial and wrongful conviction - as opposed to arrest and

pretrial detention - could find footing in the Fourteenth Amendment.)

Defendants argue merely that Hill asserts claims for false arrest, the limitations period for which began to accrue as soon as he was held "pursuant to legal process;" here, the moment a warrant was issued for his arrest or, at the latest, when he was arraigned. Although the Court does not decide whether a plaintiff who, as Hill here alleges, was arrested pursuant to a warrant based on tainted evidence, is held "pursuant to legal process," it is clear that any claims Hill may have had under the Fourth Amendment began to accrue by the time he was tried (and ultimately adjudicated not guilty by reason of insanity).[24] Thus, his Fourth Amendment claims, whatever their precise nature, began to accrue in 1999 and were prescribed by the filing of the instant suit in 2013, applying Louisiana's one-year prescriptive period for personal injury actions. La. Civ. Code ann. art. 3492 ("Delictual actions are subject to a liberative prescription of one year.")

Accordingly, Defendants are entitled to summary judgment dismissing Hill's claims arising under the Fourth Amendment for his pre-trial detention. However, as discussed above, these

---

[24] As noted, *supra*, this amounted to the functional equivalent of a conviction by suspending the limitations period for purposes of any action that would implicate the validity of the underlying adjudication and further to the extent it involved a judicial determination that the elements of the charged offense had been proven beyond a reasonable doubt.

issues do not dispose of his remaining claims relating to deprivations of due process rights under the Fourteenth Amendment. Defendants have not specifically brought limitations challenges to these claims, and as such they are waived. However, the Court notes that, in any event, such claims do not begin to accrue until the underlying wrongful conviction is vacated and charges are dismissed. *See Castellano v. Fragozo*, 352 F.3d 939, 959 (5th Cir. 2003)("Justice Scalia's opinion in *Heck v. Humphrey* answers any question of limitations in the overwhelming percentage of cases, including this case. It concludes that no such claim accrues until the conviction has been set aside where, as here, the suit calls the validity of the conviction into play.")(citing *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed. 2d 383 (1994)). Here, these occurred by April 25, 2012 - at the earliest - and were not time-barred by the filing of the instant suit on April 21, 2013.

### 3) Claims under Title II of the ADA

Plaintiffs allege that Defendants discriminated against Hill in violation of Title II of the ADA, which requires proof (1) that the plaintiff has a qualifying disability, (2) that the plaintiff was discriminated against by a public entity, and (3) that such discrimination was by reason of his disability. *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). According to Plaintiffs, the sole issue in this respect, given Hill's severe

mental illness, is whether a reasonable jury could find that Hill was discriminated against by Defendants because of his disability (e.g., because they thought they could get away with doing so). (See Rec. Doc. 112 at 25-26). In support of this contention, Plaintiffs cite Defendants' alleged (1) manipulation of identification procedures, (2) burying of exculpatory witness statements and other information, (3) and hiding of helpful crime lab reports. (Rec. Doc. 112 at 26).

Defendants counter that courts have only recognized two types of Title II claims in the context of arrests: (1) wrongful arrest, where police arrest a suspect based on his disability (i.e., misperceiving the effects of disability as criminal activity); and (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees. (Rec. Doc. 105-1 at 28)(citing *Gohier v. Enright*, 18 F.3d 1216, 1220-21 (10th Cir. 1999)).

Under the present circumstances there is nothing in the record to support a claim of wrongful arrest based on Hill's disability. As such, the sole colorable claim would be that Defendants failed to reasonably accommodate Hill as a result of his disability. Plaintiffs have failed to raise a genuine issue of fact as to this claim. All of the instances of conduct cited

40

by Plaintiffs are rendered superfluous in light of the fact that Hill was represented by counsel in connection with the original proceedings. (*See, e.g.*, Rec. Doc. 112-2 at 24 – references to motion to suppress, etc.) There are simply no allegations that Defendants took advantage of Hill's disability by, for instance, attempting to extract inculpatory admissions from him during a custodial interrogation while failing to accommodate his disability. *Compare Delano-Pyle v. Victoria County, Tex.*, 302 F.3d 567, 576 (5th Cir. 2002)(affirming jury verdict on Title II claim where officer failed to take suspect's hearing problem into account while conducting a field sobriety test and issuing *Miranda* warnings). Indeed, the record is devoid of any such admissions by Hill, who appears to have maintained his innocence throughout. Hill would not have been present for the review of the photographic lineups by E.V. and G.T. and the alleged manipulation and suppression of evidence by Defendants are unlikely to have been less effective against a non-disabled defendant, particularly one represented by counsel.

In light of the foregoing, Plaintiffs have failed to establish that a reasonable jury could find for Hill on his Title II claims and Defendants are entitled to summary judgment as to these.

### 4) Claims under State Law

Defendants specifically challenge three of the Louisiana state law claims asserted by Plaintiffs; for (i) false arrest, (ii) malicious prosecution, and (iii) intentional infliction of emotional distress ("IIED"). (Rec. Doc. 116 at 8-9). As to the former two, Defendants primarily argue that the existence of probable cause for Hill's arrest is fatal. As to the latter, Defendants assert a lack of requisite intent.

### i.    *False Arrest*

A claim of false arrest under state law in Louisiana requires showing that: (1) the plaintiff was detained and (2) that the detention was unlawful. *Dumas v. City of New Orleans,* 01-0448 (La. App. 4 Cir. 12/05/01); 803 So.2d 1001, 1003. "[P]robable cause is an absolute defense to any claim against police officers for wrongful arrest, false imprisonment, or malicious prosecution." (Rec. Doc. 116 at 8)(citing *Harris v. Eckerd Corp.*, 35,135 (La. App. 2 Cir. 09/26/01); 796 So.2d 719, 722. Probable cause is determined according to the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed. 2d 527 (1983). While probable cause is a fluid concept insusceptible of precise definition, the "substance of all the definitions of probable cause is a reasonable ground for belief of guilt . . . and that the belief of guilt must be particularized with respect to the person to be searched or

seized." *Maryland v. Pringle*, 540 U.S. 366, 370-71, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003)(internal citations omitted).

As discussed in detail above, Plaintiffs have raised a number of genuine issues of material fact surrounding Hill's arrest, which include: (1) what was known to Defendants at the time of the warrant application, (2) whether exculpatory evidence was suppressed, (3) whether the identification relied upon in securing the warrant was suggestive, and (4) whether Defendants willfully ignored evidence tending to direct the investigation away from Hill as a suspect. In light of these unresolved questions, which involve credibility determinations unquestionably reserved to the jury, the Court is unable to conclude that Plaintiffs cannot establish the absence of probable cause for Hill's arrest. As such, summary judgment is precluded as to Hill's state law claim of false arrest.

### ii.   *Malicious Prosecution*

The elements of a Louisiana malicious prosecution claim are: (1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendants against plaintiff who was defendant in the original proceedings; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage conforming to legal standards resulting to plaintiff.

*Wiley v. Wiley*, 01-0726, (La. App. 3 Cir. 11/7/01); 800 So.2d 1106, 1009, *writ denied*, 01-3232 (La. 2/8/02); 809 So.2d 129. For the same reasons as above, a genuine issue persists as to the existence or lack of probable cause for Hill's arrest. Further, although the Fifth Circuit has since concluded that there no longer exists a constitutional violation co-extensive with the elements of the common law tort of malicious prosecution, such was previously the case. *See Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003). And still, a successful showing of deprivations of due process rights under the Fourteenth Amendment stemming from the manipulation or suppression of evidence in order to initiate a prosecution - as Hill has established here – overlaps to a large degree with the elements of a state malicious prosecution claim. *See id.* Further, in light of Hill's allegations concerning the manipulation and suppression of exculpatory evidence, Defendants are incorrect that the record does not contain any indication of malice on their behalf for this type of claim. (See Rec. Doc. 116 at 9); *Sanders v. English*, 950 F.2d 1152, 1163 ("Deliberately concealing or deliberately failing to disclose exculpatory evidence, like 'maliciously tendering false information,' can, as under the circumstances here present, form the basis for an inference that a defendant police officer acted with malice in initiating and maintaining a prosecution.")

44

Accordingly, Defendants are not entitled to summary judgment on Hill's malicious prosecution claim.

### *iii.* *IIED*

A claim of IIED in Louisiana requires: (1) extreme and outrageous conduct by the defendants; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendants desired to inflict severe emotional distress *or knew that severe emotional distress would be certain or substantially certain to result*. *White v. Monsanto*, 585 So.2d 1205, 1209-10 (La. 1991); *Biagas v. St. Landry Parish Sheriff Office*, 13-642, (La. App. 3 Cir. 12/11/13); 132 So.3d 971, 974. Here again, Defendants misconstrue the nature of Plaintiffs' allegations as well as the lens through which these are viewed in the context of a summary judgment motion. Drawing all reasonable inferences in favor of Hill, his allegations are that Defendants deliberately manipulated and suppressed evidence in an effort to secure Hill's arrest and ultimate adjudication. If the jury were to so find, there is no plausible argument to be made that Defendants would not, at the very least, have been aware that severe emotional distress would be substantially certain to result to Hill. Moreover, such conduct would clearly rise to the level of extreme and outrageous, which is defined as exceeding "all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Monsanto*,

*supra*, 585 So. 2d at 1209. This is rendered particularly so in light of Hill's mental illness. *See id.* at 1210. ("The defendant's knowledge that plaintiff is particularly susceptible to emotional distress is a factor to be considered."). Indeed, Plaintiffs' allegations in the instant case amount to the rare factual predicate in which a colorable claim of IIED actually exists. Accordingly, Defendants are not entitled to summary judgment on Plaintiff's IIED claim.

### 5) Claims against Defendant Ronal Serpas in his Official Capacity

Plaintiffs voluntarily dismissed their claims against Defendant Ronal Serpas in his official capacity in their Response to Defendants' Motion for Summary Judgment (Rec. Doc. 112 at 3, n.3)("Plaintiffs voluntarily dismiss their *Monell* claim (Count X)). As such, the sole issue for the Court on this item is Defendants' entitlement to fees incurred in association with defending against Plaintiffs' *Monell* allegations. While prevailing plaintiffs are entitled to attorneys' fees *unless* special circumstances would render an award unjust, prevailing defendants are entitled to attorney fees *only* when the underlying claim is frivolous, unreasonable, or groundless. *Mississippi*, *supra*, 921 F.2d at 609. *U.S. v. Mississippi*, 921 F.2d 604, 609 (5th Cir. 1991). To determine whether a plaintiff's civil rights action is frivolous, the court may

consider: (1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the court dismissed the case or held a full trial. *Myers v. City of West Monroe*, 211 F.3d 289, 292 (5th Cir. 2000). If a plaintiff presents some credible evidence in support of the claim, then the case has merit and an award under Section 1988 is inappropriate. *Hahn v. City of Kenner*, 1 F.Supp. 2d 614, 617 (E.D. La. 1988).

On this issue, Defendants argue Plaintiffs asserted a *Monell* claim supported merely by conclusory allegations that the "NOPD maintained a policy, custom, or pattern and practice of condoning corruption, that included widespread investigative misconduct, including by failing to supervise, discipline, and train its investigative officers." (See Rec. Doc. 116 at 10). The Court cannot agree as to the conclusory nature of these allegations. Plaintiffs' Complaint cites to various sources, including*, inter alia*, a report by the International Association of Chiefs of Police, contemporaneous public admissions by the NOPD itself, and a collaborative finding by the Louisiana National Guard and the City of New Orleans, detailing extensive abuses in the Department and lapses in training standards – relating in particular to photo lineup procedures - during the

early 1990s.[25] Indeed, the NOPD's failings during this period are notorious and have been extensively documented.[26] Accordingly, the Court cannot conclude that Plaintiffs' allegations that inadequate training and patterns of investigative misconduct may have led to the erroneous arrest and prosecution of Hill during this same period were "frivolous, unreasonable, or groundless." While discovery may ultimately have proven otherwise, the claims were not baseless at the outset and this motion for summary judgment was the first opportunity in which to address their dismissal. Accordingly, Defendants are not entitled to attorney's fees on Plaintiffs' *Monell* claims.

### B. Claims of Plaintiff Marie Hill

As to Plaintiff Marie Hill's claims under § 1983 relating to deprivations of the rights of familial association and integrity, Defendants are entitled to qualified immunity. Marie Hill argues that Defendants "deliberately violated [her] clearly established First and Fourteenth Amendment rights to be free from unwarranted government interference with her familial

---

[25] These include, specifically, alleged findings by the Chiefs of Police report that the department's failures leave it "dangerously defenseless against failure-to-train based allegations and lawsuits." (Rec. Doc. 1 at 21).

[26] The Court takes judicial notice of the fact that the NOPD is currently the subject of a consent decree with the United States Department of Justice, which is overseen by another section of this Court and relates specifically to alleged patterns of civil rights violations and other misconduct by the department. *See United States v. City of New Orleans*, 12-cv-1924 (E.D. La. 2012)(Morgan, J., presiding).

relationship to Hill without due process of law." (Rec. Doc. 1 at 192).

Defendants counter, first, that this right does not exist and, second, if it does at all, it was not "clearly established" to warrant liability under § 1983 at the time of Hill's arrest in 1992. Because the Court concludes that the right asserted by Plaintiff is still not "clearly established," for purposes of the qualified immunity analysis, Defendants prevail on this issue.

The only contemporaneous decision cited by Plaintiffs that arguably supports their position is *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 391 (5th Cir. 1992). That case involved the suicide of a pretrial detainee, alleged to have resulted from prison officials' failure to provide him with reasonable medical care. *Id.* at 388. The decedent's mother sought to recover, not as representative of her son's estate for his own injuries under the Texas wrongful death statute, but rather in her own capacity under § 1983. Writing in 1992, the Fifth Circuit stated: "The right to such recovery under § 1983 has 'generated considerable confusion and disagreement,' *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991), over which the circuits have divided. *Compare Jaco v. Bloechle*, 739 F.2d 239, 243 (6th Cir. 1984) and *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984). The Supreme Court has yet to decide this question." *Id.* The court

ultimately concluded that its "decisions allow recovery by [the mother] for her injury caused by the state's deprivation of her son's constitutionally secured liberty interests." *Rhyne*, *supra*, 973 F.2d at 391. Given that the *Rhyne* court itself acknowledged the fractious state of the law in this area in 1992 and that the *Rhyne* opinion does little to illuminate the parameters of the alleged cause of action - declining to elaborate in light of the fact that the plaintiff had failed to present sufficient evidence of a constitutional deprivation – the Court cannot say that there was a clearly established right of familial association that would allow a mother to recover for the unconstitutional deprivations of liberty occasioned against her son by the state in 1992 under § 1983. *Id.*

Plaintiffs are correct that *Hope v. Pelzer* eschewed a narrow, case-specific interpretation of when a constitutional right can be said to be "clearly established" in order to defeat qualified immunity, directing instead merely that "in the light of pre-existing law the unlawfulness must be apparent." 536 U.S. 730, 739 (2002). However, subsequent decisions have winnowed the scope of *Pelzer* to require more than Plaintiffs have asserted for purposes of the instant cause of action. *See*, *e.g.*, *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011)("We have repeatedly told courts . . . not to define clearly established law at a high level of generality. . . . The general

proposition, for example, that an unreasonable search and seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.") It is insufficient to rely upon the broadly framed recognition of a right to family autonomy recognized in cases such as *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Moore v. City of East Cleveland*, 431 U.S. 494, 499 (1977). Further, as recently as 2012, in a similar case, the Fifth Circuit found a lack of "caselaw that indicates that a parent of an adult child has a right to visitation with that child." *Beddingfield ex rel. Bedingfield v. Deen*, 487 F. App'x 232-33 (5th Cir. 2012). The court concluded, therefore, that the plaintiffs had not demonstrated the defendants had "violated a clearly established constitutional right to familial association." *Id.* Compelling as Plaintiffs' arguments that Hill's disability renders his relationship to his mother the functional equivalent of that between a minor child and parent may be, Plaintiffs cite no legal support for this contention and fail to address the fact that Hill appears to remain, for legal purposes, a person of full majority, (i.e., there is no indication that he has been interdicted, so as to legally affect his status in this regard).

In light of the foregoing, Defendants have shown an absence of genuine issues of material fact and an entitlement as a

matter of law to the defense of qualified immunity on this issue. They are therefore entitled to summary judgment dismissing Mrs. Hill's § 1983 claims. The Court notes that Defendants have not challenged Mrs. Hill's state law consortium claims, and these remain viable.

**Conclusion**

As elaborated above, **IT IS ORDERED THAT** Defendants' Motion for Summary Judgment (Rec. Doc. 105) is **GRANTED IN PART** and **DENIED IN PART**, as follows:

(1) **DENIED** as to Darrin Hill's Fourteenth Amendment due process claims;

(2) **GRANTED** as to Darrin Hill's Fourth Amendment claims;

(3) **DENIED** as to Darrin Hill's state law claims; and,

(4) **GRANTED** as to Marie Hill's claims under § 1983.

New Orleans, Louisiana, this 12th day of January, 2015.

UNITED STATES DISTRICT JUDGE